So we will move on to Windy City Limousine Company against Cincinnati Financial Corporation, number 21-3296. And when you are ready, Mr. Kirshner, we will hear from you. Thank you. Good morning. May it please the Court. My name is Dan Kirshner, and I represent the Lower Course Dismissal, Windy City's complaint. We understand that standing here, we are asking this Court to thread the head of a very fine needle in the strong headwind of substantial... Can we still do that after the East Coast Entertainment case that was issued, I think, last week? Yes, I'll tell you... Is there any hole left in that needle? I'm going to try today. Okay. I think we need an electron microscope. As Judge Wood wrote in the Sandy Point decision, which Judge Hamilton was also part of, harder questions arise when facts are tweaked slightly. And in this instance, I think we have some facts tweaked slightly that I'd like to present to the Court, if you'll bear with me. Windy City is different than Sandy Point and different than East Coast Entertainment and many other businesses in a couple of respects. One, it's an essential business, so part of our claim is not based upon laws due to executive order. Second, in our complaint and in our claim that we put forth to Cincinnati, we specifically identified, by name, individuals, both customers and staff of Windy City, who had confirmed cases of COVID. And as a result, and Windy City is a transportation company, they provide buses and limousines, that the vehicles that those customers occupied were then immediately taken offline and out of service for a time. But that wasn't because the vehicles were physically damaged. I mean, the main point remains. The virus doesn't physically damage things. Yes, and Your Honor addressed that. It doesn't wipe it off. And does this policy apply to the vehicles? It's part of the property, yes. The vehicles are part of the overall property of the business. I thought we were told that the vehicles were covered under separate policies. My read of the policy and the claim we put forth to Cincinnati is that... I'll ask Mr. Litchfield. That part was not flushed down the end of it, but that is part of our complaint. Um, Your Honor, I think the distinction that you raised in the Sandy Point case is this, is the question of whether or not COVID causes physical alteration to property. And you answered, it does not. Because you can squirt some Clorox on it and wipe it off. Yes, but I'd like to address that in two points. But Your Honor also pointed out many examples of where coverage can exist without physical alteration. On an engineering and material science level, and you put forward the examples of asbestos and gas leaks, ammonia spills, and carbon monoxide infiltration, to name a few. And with each of these examples, records have found these to be within the crosshairs of coverage. They didn't change the appearance or the shape or the color or the structure or the material dimension of the property. What they did do, nonetheless, deprive the property owner of their property during a period of restoration and cause complete dispossession of that property. And I think in reading Your Honor's... My colleague would remind you that these are opinions of the court. Yes, and Judge Campbell certainly... But in terms of the way the courts are really looking at these issues, there are really two ways in which we can get to this end. One is which being the crosshairs of physical loss and damage of property, where there's some physical alteration to the property, or where it is so substantial that it is deemed to be that because of the dispossession and the required period of restoration. And I think while we would certainly argue and lose that we fit that first model, I think we certainly fit that second, where we... There's a pretty long... Citations in their brief. It's 50 pages of string cite, yes. Your argument has not gotten much traction around the country. I agree with you on that one. I'm dismayed, but that's where I am today. And there are two parts to our dismay. One is obviously that, that we think it does physically alter. Because while I think there's been this repeated adage that, well, you can just wipe it away. You know, and we put forward in our complaint itself that there are also studies that say can last as long as 28 days on surfaces. And that's something that can... And certainly your honor appreciates, the whole panel appreciates the severity of the pandemic we've been through. But this is not as one jurist wrote in another jurisdiction. Well, what about when the customer goes in and just sneezes on the bar? Can the bar then shut down and say, we want to be paid by an insurance company? We have a million people that have died in this country. 40,000 in this state alone. We're not talking about sneezing on a bar. I think a better analogy is if you have a customer who walks in that bar and pours anthrax powder all over that bar. Well, we don't have any physical alteration to the property, but we know that bar has to be cleared out. We know there has to be remediation. We know that there has to be a period of restoration. And the question... And that involves wiping that up. What's the scope of the insurance policy that we're dealing with? Because one can be dispossessed from property, not because the property itself is damaged, but because there's some other reason, you know, to say that you can't go there. Maybe it's in an area of a city, which different language in the policy covers. I mean, these are just like, what insurance policy got written to cover which risks? Well, they're written as all risks, unless otherwise excluded, as long as they're within the cross-services coverage. But then they use the language physical loss or damage. They do. And one of the things we point out in our brief, which wasn't addressed in Sandy Point or in East Coast Entertainment, is the interplay between that and another section of the policy where property damage is defined. And I know the other... That's the liability part. I understand that. And other courts have said, but that's a whole other section. But then that's kind of putting aside this whole notion that when you read a contract for its understanding of its terms, you have to read the contract as a whole. And reading the contract as a whole, and you want to look to what the understanding of the parties were, terms of the words that they use, you don't use a dictionary. You use the definition of the policy. And here in one section, we have damage to property. And in another section, the same words, only written as property damage. But we want to throw out the definition over here and say that this is clear if we go over here and look at a dictionary. Well, that's not the way contract law is supposed to work. The parties use those words to mean things and they defined what property damage meant in there. And the courts have been applying it to mean something else. Could you address the Second Circuit's reasoning on that point? I'm sorry, Your Honor. Could you address the Second Circuit's reasoning on that point in the case? It was 10012 Holdings. I apologize. I'm not prepared to do that. I'll pass it ahead, Your Honor. All right. But I am aware that there are many courts which have addressed that argument and have put that argument back. Well, I don't see, I didn't see any appellate courts that had accepted the argument you're making to borrow. And the Second Circuit had expressly rejected it as a matter of New York law. Yes. I am aware then that that would be the Second Circuit that I'm aware of then. So I do come before you with really, I think, the distinction here when you look at cases that really are more analogous like asbestos, ammonia spills, carbon monoxide infiltration. That's a matter of opening a window. That's a matter of opening a window. And I don't see how that is that much different than the gravity of COVID on a premises. Especially when you look at it through the lens of not sitting here today as we all are double vaccinated and double boosted and all this different research and different strains. But back in March and April of 2022 when the world shut down, when our client is looking to their insurer on their own website, telling them, make sure you do this, make sure you do that and getting information from different governmental entities. But what was reasonable at that time for what Windy City was supposed to do with these vehicles? And we think it was reasonable at that time for them to treat these vehicles as if they had been contaminated with anthrax and pull them and do what's right by their staff and their customers and pull them out of service. Put them aside for a period of time. Do a deep cleaning. And when staff in the office gets sick, shut that office down. It doesn't mean the business shuts down. You can still work remotely, but the law doesn't say the business has to shut down. You have to be dispossessed of the property. And Windy City was dispossessed completely of certain vehicles for a period of time while they were being remediated and of its office space for a period of time while it's being remediated. And that dispossession during that period of restoration had a financial impact on this business that we believe is compensable under the policy. And I thank you, Your Honor. All right. Thank you. Mr. Litchfield. Thank you, Your Honor. Good morning. May it please the court. I can clear one thing up very, very quickly. The policy, which is a commercial business property policy, defines covered property. That is the kind of property that we will cover. And it has a list of types of property that are not covered property. And item, letter P, which is on page 5 of 40 of the main coverage form here, and the coverage form name is FM 101, 05 of 16, says among the types of property that we do not cover under this policy are vehicles or self-propelled machines. That's the title of that section. And then it goes on to talk about essentially the difference between something like a machine you'd use in a warehouse versus something that's licensed and on the road. And apart from that, it unambiguously excludes vehicles or self-propelled machines as covered property. And there's a good reason for that because, you know, one thing insurance policies, and I think Your Honor pointed this out a moment ago, one thing insurance policies do do is they coordinate between different kinds of coverage. And that coordination is seen in the difference between an auto insurance policy on the one hand, which we're not here to talk about today, and a property insurance policy on the other. Sandy Point simply resolves this case. And if there were any doubt, East Coast Entertainment would do so on its own, which itself follows Sandy Point. We're dealing with the same Cincinnati policy here as in Sandy Point. We're dealing with the same gubernatorial orders. We're dealing with the same allegations in the complaint. And I need only point you to paragraphs 22 and 23 of the complaint to prove that we're dealing with exactly the same allegations that this court determined in Sandy Point and East Coast Entertainment are insufficient to state a claim in affirming those dismissals. So I think we have agreement that Sandy Point controls here. I think that probably goes a little bit toward the idea of the eye of the needle and the headwind. And I agree. It absolutely controls here. What are the three claimed differences that they say distinguish their complaint from Sandy Point such that their complaint should go forward? This is in their reply brief and we heard a little bit of it a moment ago. First, there's the statement that, well, Windy City was an essential business. That strikes me as a classic distinction without a difference. There's been no articulation of why that matters. From the point of view of access... There's no policy language that would single out businesses that were under special state or legal restrictions, right? I mean, there's some. Actually, there are some, but are there any... Not here. Not directly, Your Honor. Well, with the exception that there are provisions in our policy dealing with ordinance or law, but they're not at issue in this appeal. We're focused on whether there's direct physical loss or damage to Windy City's property and not the limos for the reason I just gave you. So we're talking about their office, their desks, their chairs, their ceilings and walls. None of which, by the way, they want repaired, rebuilt or replaced. In a traditional property claim when the place burns down, quite rightly, the policyholder desires and we supply repair, rebuilding or replacement as is necessary. None of that's going on here. What they want is the business income that they lost. The allegations of why they lost that business income are in the paragraphs I noted a moment ago. Now, the other thing that they point to is the actual presence of sick people in the office. This is dealt with in Sandy Point. Sandy Point deals with the argument that sick people in a premises somehow causes direct physical loss or damage to that premises. East Coast and other cases that we rely on, including all of the federal circuits that have addressed this, and that's everybody except the first and the third at this point. Amongst that jurisprudence, they've dealt with the idea that one surfaces bits and pieces of COVID-2 particles and surfaces somehow damage them. That's all been disposed of as well as has this court. So that's not a distinction between their complaint and the complaint that was insufficient in Sandy Point. Last, we have this business about the definition of property damage in the GL policy. I think the case that they cite and rely on most for that is the McDowell case that you're supposed to look at the whole policy. But in McDowell, that was a legal malpractice policy. There was no property insurance policy at issue there. There was no issue of whether one should jump the tracks from one type of coverage to another in order to interpret the coverage at issue. It was all and only about the legal malpractice coverage. So it doesn't really speak to what they're asserting should be done here. More importantly, as is pointed out earlier, that's a general liability policy. It protects Windy City from claims by third parties against Windy City, such as negligence claims. That's not at all what we're dealing with here. When we look at the entirety of the property policy and interpret it as a whole, which is, I think, the spirit and letter of McDowell and the other cases they rely on, we're not dealing with something where you would go look at the definition of property damage for purposes of the general liability coverage and have that in any way impact the interpretation that you would make here. And that argument was made in Sandy Point. I believe that was made by TJBC. And it was in the record. It was in the briefing. Although this court clearly did not address that issue in its decision as written, that was fully briefed to the court. And the court, you know, I think there are propositions of law in some cases, it would say, we're entitled to presume that the court didn't see that as a reason to reverse the underlying decision of the U.S. District Court since the court affirmed instead. So those are the differences that they point to. And by the way, let me point something else out about the general liability coverage. Separate declarations page, separate terms and conditions. One of those terms and conditions is an exclusion for damage to property that the policyholder owns. Why? Because that's slotted to be over in the commercial property policy as opposed to being a liability type coverage. It wouldn't make sense in a liability context. So just another reason why it's important to not jump the tracks from the general liability coverage that's in the policy here versus the commercial property coverage. And we've cited a number of cases. They are from U.S. District Courts, but they involve the same COVID coverage disputes that we're dealing with here today. And those cases establish that one should not jump the tracks in that way. This court by no means needs any confirmation of its Sandy Point decision. It's a decision that stands on its own, is well-reasoned and states its reasoning. But since that decision came down, three courts of appeal in Illinois state court system, Lee, Sweetberry and ABW have followed Sandy Point. Very good indication that this court did an excellent job of predicting what the Illinois Supreme Court would ultimately do with this and certainly what the Illinois appellate courts are doing with this. East Coast Entertainment, of course, follows Sandy Point. I already mentioned the lineup of cases from all the circuits. And I apologize for how long our string site has to be. I've never done anything like that before in my career, but I've never had a circumstance like this where in the course of two years, literally hundreds and hundreds of courts, U.S. district courts, U.S. courts of appeals, state trial courts and state courts of appeals have so overwhelmingly reached the exact same conclusion, both in interpreting the policy language involved, interpreting how it applies to certain types of allegations, such as the allegations made here by Windy City. This all happened since the first case came down in May of 2020. That was from the Southern District of New York and social life. The take on social life are the, by now, I think prescient words of that judge in the very first decision that I get this. This is about damage to lungs, not damage to property. And that's a point where I could reach some agreement with what counsel said. This is a horrible disease. It's affected all of us to some degree of separation or another, including close family members. People have died. People's lives have been changed forever. Nobody in any way wants to suggest that there's, there isn't a tremendous issue with the disease. It damages lungs. People to people cause the transmission of this and it damages them. It's not about property. It's not about damage to property as this court has so correctly held. Appellate courts in Indiana, as well as in Ohio and Michigan, have also agreed with this court. If not by citing this court's decision in Sandy Point, certainly have agreed in all fours on very similar facts of what this court has done. No federal or state appellate court has bought the policy holder arguments to this point. And there are no dissents in any of these state or federal appellate court decisions. Illinois law establishes the clear unambiguous meaning of the words direct physical loss or damage. Precedents from this court do as well and establish how it should apply to allegations like this. We ask this court to affirm the dismissal of the complaint. Thank you very much. Thank you, Mr. Litchfield. Mr. Kirshner, anything for, did you have any more time? I'll give you a minute. I would simply say that given the court's discouragement of string sites, we get credit for no string sites. Excellent. All right. Thank you very much. Thanks to both counsel. The court will take this case under advisement.